IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

JANET E. MEALING                                                                PLAINTIFF

v.                          Civil No. 04-3023

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                                  DEFENDANT

**MEMORANDUM OPINION**

Plaintiff Janet E. Mealing brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act and her application for supplemental security income (SSI) benefits under Title XVI of the Social Security Act.

**Procedural Background:**

Mealing filed applications for DIB and SSI on November 8, 2000, alleging a disability onset date of October 1, 1995, due to pain and stiffness resulting from back surgery, arthritis, and brain damage. (Tr. 126). An administrative hearing was held on June 19, 2002. (Tr. 34-42). Mealing was present and testified but was not represented by counsel. (Tr. 25).

By written decision dated September 5, 2002, the administrative law judge (ALJ) found that, although severe, Mealing's impairments did not meet or equal the criteria of any of the impairments listed in Appendix I, Subpart P, Regulations No. 4 (Tr. 30). After discrediting Mealing's subjective allegations, the ALJ concluded that she maintained the residual functional capacity (RFC) to engage in a full range of medium work. (Tr. 31). Specifically, he stated that

-1-

she was capable of lifting up to fifty pounds occasionally and twenty-five pounds frequently and standing, walking, and sitting for six hours during an eight-hour workday. As such, the ALJ concluded Mealing could return to her past relevant work as a security guard. (Tr. 31).

Mealing appealed the decision of the ALJ to the Appeals Council. (Tr. 20). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Mealing's request for review. (Tr. 5-7).

The case is before the undersigned pursuant to the consent of the parties. By memorandum opinion entered on March 31, 2005 (Doc. 8), the case was administratively terminated to allow the Commissioner to supplement or reconstruct a missing portion of the transcript. The missing portion was filed with the court on May 19, 2005, and on May 26, 2005, the case was reopened (Doc. 12).

**Evidence Presented:**

At the time of the hearing before the ALJ on June 19, 2002, Mealing was fifty-six years old and possessed a high school education with some college course work. (Tr. 26). She lived in a house with her companion Charles Almond. (Tr. 37).

Mealing testified she last worked in 1995 as an unarmed security guard. (Tr. 35, 38, 39). At the time, she lived in California. (Tr. 35). She left that job because she could no longer met the physical demands of her job. (Tr. 36). She testified the job was physically demanding because she had to be up and walking, checking doors, and securing areas. (Tr. 39). She testified she could sit for a short period of time and walk for a short period of time. (Tr. 39).

She looked for other jobs, anything she could get, but was unable to find employment. (Tr. 36). In 1997, she moved to Colorado. (Tr. 36). About that time, she had a small inheritance

AO72A
(Rev. 8/82)

she was living on and she tried to get a small business going out of her apartment. (Tr. 36). She was not successful. (Tr. 36). About six months later, she moved to Arkansas. (Tr. 37).

After she moved to Arkansas, she did not look for work. (Tr. 37). She still had her inheritance and planned on opening a small herbal business. (Tr. 37). However, she hadn't been able to do that and over a period of years all her funds were wiped out. (Tr. 37).

With respect to her daily activities, Mealing testified she did a lot for Almond including giving him his insulin in the morning and checking his blood sugar level. (Tr. 40). She indicated he cannot prepare meals because of his heart problem so she has to make sure he gets his meals. (Tr. 40). If she is lucky, she testified she might be able to get one load of wash done in a day. (Tr. 40). When she cleans, she testified it takes her all day to clean one room. (Tr. 40).

At the time of the hearing, she was seeing a doctor. (Tr. 38). She started seeing him in 2000. (Tr. 38).

Mealing testified she was taking a couple of medications. (Tr. 40). She indicated the medications seemed to be helping a bit because she was not falling quite as often as she did. (Tr. 40). She indicated she uses a cane even around the house because she falls down all the time. (Tr. 40).

Mealing indicated the doctor was not sure exactly what all was wrong with her and wanted to run more tests. (Tr. 40). Mealing testified she has trouble everyday although some days are a little better than others. (Tr. 41). On a better day, she indicated she gets up and prepares Almond's breakfast, does the dishes, gets a load of wash done, and maybe gets some dusting done. (Tr. 41). On a bad day, Mealing stated she would be in bed most of the day. (Tr. 41). Since she had started on medication, she indicated she had about half good days and half

-3-

bad. (Tr. 41). Before she started on medication, Mealing indicated she had more bad days than good. (Tr. 41).

Mealing drives but does not take her medication when she does. (Tr. 41). She lies down anywhere from two to four hours each day. (Tr. 41A).

Floyd John Massey, Jr., a vocational expert, was called. (Tr. 39). Massey testified the security guard position would be a semi-skilled job of a light nature at a SVP of three. (Tr. 39).

The record contains the following medical and vocational evidence. On May 30, 2001, Mealing filled out a disability supplemental interview outline. (Tr. 119-123). She listed her weight as 175 and height as 5' 2". (Tr. 119). She has two years of college. (Tr. 122).

She indicated that she needed help most of the time to bathe, dress, and shave herself and take care of her own hair care needs. (Tr. 119). She indicated she could do laundry, dishes, change sheets, vacuum/sweep, take out the trash, and sometimes do garden work. (Tr. 119). She stated she could not iron, wash the car, mow the yard, or rake leaves because she had pain. (Tr. 119). She also stated that it took her all day just to clean one room. (Tr. 119).

She stated she could shop for groceries or clothes, do the banking, and go to the post office. (Tr. 119). However, she stated it was very hard for her to do these activities because of the pain. (Tr. 119). She stated she prepared meals seven times a week including sandwiches, frozen dinners, meats, vegetables, and desserts. (Tr. 120). She indicated it took her an hour or two to prepare a meal and took longer since her disability began. (Tr. 120).

She indicated she could pay bills, use a check book, and count change. (Tr. 120). She stated it takes her a very long time to do these activities because of the pain and swelling in the

AO72A
(Rev. 8/82)

joints of her fingers. (Tr. 120). She stated she could drive but not on unfamiliar routes and not for any long periods of time. (Tr. 120).

She did not use any assistive devices. (Tr. 120). She spends her time watching TV, and she tries to read. (Tr. 120). She indicated she had tried to go fishing but had to have a friend bait the hook for her. (Tr. 120). Mealing indicated her disability interfered with her ability to work due to the limitations put on her from her back surgery. (Tr. 120).

She indicated she sometimes suffered from unusual fatigue and sometimes had to rest once a day for one to two hours. (Tr. 121). She described her pain as severe and sharp pain in the feet, knees, hips, hands, neck, shoulders, and back. (Tr. 121). She stated she had swollen joints and her fingers and toes were getting crooked. (Tr. 121). She indicated the pain interfered with her sleep and she had pain everywhere. (Tr. 121).

She stated the pain eased up only when she took a pain pill. (Tr. 121). She indicated she had pain all the time. (Tr. 121). She stated she hurts all the time whether she is resting or active. (Tr. 121). She stated that her knees hurt so bad they go out on her and she falls. (Tr. 123). When she goes shopping, she leans on the cart and hopes she doesn't fall. (Tr. 123). She indicated she has to crawl up and down steps most of the time. (Tr. 123). She stated she has difficulty in getting up from a seated position because she cannot push or pull herself up. (Tr. 123).

She stated she could stand or walk about half an hour before the pain occurred and could sit about half an hour. (Tr. 121). She stated nothing but medication made the pain better. (Tr. 121).

AO72A
(Rev. 8/82)

Since her disability began, Mealing indicated she kept to herself more because she didn't like people feeling sorry for her. (Tr. 122). On an average day, she dragged herself out to feed the chickens, tried to do laundry or clean a little, rested, made supper, did the dishes if she was able, sat down and rested often due to the pain, and watched television or a video. (Tr. 122).

Records indicate she saw Dr. Travis Embry on August 25, 2000, and September 8, 2000. (Tr. 132-133). He diagnosed her as suffering from rheumatoid arthritis and fibromyalgia. (Tr. 132-133).

On February 6, 2001, Mealing underwent a general physical examination performed by Dr. Clyde H. Underwood at the request of the state disability determination agency. (Tr. 136-143). At the time, Mealing gave a history of having had two back surgeries one in 1970 and one in the 1980's. (Tr. 136). She reported having arthritis in her joints. (Tr. 136 & 138).

Upon examination, Mealing had a slightly decreased range of motion in her lumbar spine, cervical spine, wrists, hands, hips, and ankles, but no heat or swelling was noted. (Tr. 139-140). She exhibited no muscle weakness or atrophy but did have some decreased sensation in her right foot although proprioception was intact and there was decreased dorsalis pedis and posterior tibial pulses. (Tr. 140).

Dr. Underwood noted Mealing's gait and coordination were slow and deliberate but she was able to stand and walk without assistive devices. (Tr. 141). He noted she held a pen and wrote with difficulty and that her grip was 50% of normal on the right. (Tr. 141). Dr. Underwood's diagnoses were: generalized osteoarthritis; residual stiffness; in coordination; and degenerative disease in her lumbar spine. (Tr. 142).

On February 20, 2001, a physical residual functional capacity assessment was completed by Dr. Ronald Crow, a medical consultant. (Tr. 144-151). With respect to exertional limitations, it stated Mealing could occasionally lift or carry fifty pounds; could frequently lift or carry twenty-five pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and her ability to push and pull was unlimited, other than as shown for lift and/or carry. (Tr. 145). No postural, manipulative, visual, communicative, or environmental limitations were established. (Tr. 146-148).

Pharmacy records dated May 28, 2002, indicate Dr. Travis Embry had prescribed Mealing Prilosec, Cyclobenzapr, Wellbutrin, and Hydroco/Apap. (Tr. 129-130). On June 6, 2002, Dr. Embry wrote that Mealing had a past medical history of dyspepsia and subjectively a history of peptic ulcer disease. (Tr. 152). He noted her past surgical history included a tonsillectomy and laparoscopy of her abdomen and that she had scars and a subjective history consistent with L4-L5 laminectomy. (Tr. 152).

Dr. Embry indicated she was on intermittent medications for pain and occasional illnesses and had a family history of arthritis. (Tr. 152). Dr. Embry stated he had seen her as a patient in the year 2000 and then on May 10, 2001, and May 28, 2002. (Tr. 152). Her diagnosis at the time included "fibromyalgia, depression and anxiety with a lot of subjective complaints and disability issues." (Tr. 152). He noted her laboratory tests were normal. (Tr. 152). He stated he had been attempting to get her old medical records from a doctor in California by the name of Paul Vernow. (Tr. 152).

Dr. Embry stated her diagnosis was consistent with fibromyalgia. (Tr. 152). Symptomatic care for dyspepsia had been provided. (Tr. 152). Dr. Embry indicated there were

-7-

also some issues of depression and she had been prescribed antidepressants and counseling. (Tr. 152). Specifically, Dr. Embry stated she had been placed on Wellbutrin. (Tr. 153). For pain, Dr. Embry noted that Mealing had requested Vicodin ES and had been given "a small scrip while we try to work out old records." (Tr. 153). He further stated "[i]t would not be recommended that she be on chronic pain protocol, however, until this is further elucidated." (Tr. 153). Dr. Embry noted that further evaluation and documentation of her illness might require speciality consultation, s-ray and other imaging studies. (Tr. 153).

On April 23, 2003, Dr. Embry wrote that Mealing's diagnoses include: "peptic ulcer disease, fibromyalgia, depression, borderline hypoglycemia, and chronic pain syndrome secondary to chronic low back pain." (Tr. 168). He stated he had seen her three or four times since November 22, 2002, and had become more familiar with her limitations. (Tr. 168). He noted she had a L4-L5 laminectomy twice and had been placed on restrictions by her neurosurgeon with "no lifting of more than ten pounds, no repetitive lifting, stooping, pushing, pulling, or bending, and no long periods of time sitting or standing." (Tr. 168). He stated these restrictions seemed reasonable and would place her in a disabled classification. (Tr. 168). Given the limited information available and her prognosis, he noted that speciality consultation would be helpful. (Tr. 168).[1]

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir.

---

[1] We note we consider this evidence, as it was submitted to the Appeals Council and the Appeals Council considered it before denying review. (Tr. 5-8) *See Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994).

AO72A
(Rev. 8/82)

2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or

AO72A
(Rev. 8/82)

mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

In this case, we believe remand is necessary. First, the ALJ failed to give proper consideration to Mealing's diagnosis of fibromyalgia. Instead, he merely noted that what little objective medical evidence there was in the record did not substantiate the degree of limitation Mealing testified to.

Fibromyalgia involves pain in fibrous tissues, muscles, tendons, ligaments and other "white" connective tissues. Diagnosis is recognized by a typical pattern of diffuse fibromyalgia and nonrheumatic symptoms, such as poor sleep, trauma, anxiety, fatigue, irritable bowel symptoms, exposure to dampness and cold, and by exclusion of contributory or underlying diseases. *See The Merck Manual,* pp. 1369-1371 (16th Edition, 1992). Its cause or causes are unknown, there is no cure, and, perhaps of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. *Forehand v. Barnhart*, 364 F.3d 984, 987 (8th Cir. 2004). The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character— multiple tender spots, more precisely eighteen

fixed locations on the body (and the rule of thumb is that the patient must have at least eleven of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient who really has fibromyalgia to flinch. *See The Merck Manual,* pp. 1369-1371 (16th Edition, 1992).

We recognize that it is difficult to determine the severity of plaintiff's condition because of the unavailability of objective clinical tests. Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not. Michael Doherty & Adrian Jones, *Fibromyalgia Syndrome (ABC of Rheumatology)*, 310 BRITISH MED. J. 386 (1995). The question is whether the plaintiff is one of the minority, or not.

The medical evidence clearly indicates that plaintiff had been diagnosed with fibromyalgia. (Tr. 132, 168). However, it appears the ALJ gave little weight to the diagnosis of fibromyalgia or its debilitating effect. Rather, he focused his attention of plaintiff's reported ability to perform household chores, care for her personal needs, and assist her disabled companion. (Tr. 29). Contrary to the ALJ's assertion, the Eighth Circuit has held, in the context of fibromyalgia cases, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity. *Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003); *See Kelley v. Callahan,* 133 F.3d 583, 588-89 (8th Cir. 1998). Accordingly, plaintiff's ability to perform these tasks does not automatically render her capable of performing work.

Therefore, because the ALJ improperly discredited plaintiff's subjective complaints of pain without considering the impact of her fibromyalgia, we find that his conclusion that plaintiff is not disabled is not supported by substantial evidence in the record as a whole. Accordingly, we believe remand is necessary in order to allow the ALJ to further develop the record regarding

plaintiff's fibromyalgia and for a reevaluation of plaintiff's subjective complaints in light of this diagnosis. On remand the ALJ should re-evaluate plaintiff's subjective allegations in accordance with *Polaski*, 739 F.2d at 1322, specifically discussing each *Polaski* factor in the context of plaintiff's particular case.

Second, we believe the record needs further development as to any restrictions there are on Mealing's physical or mental capabilities due to her chronic low back pain, depression, and chronic pain syndrome. On remand, the ALJ may want to obtain further information from Dr. Embry, Mealing's treating physician, regarding her capabilities.

**Conclusion**:

For the reasons stated, the court finds that the decision of the Commissioner denying benefits to the plaintiff should be reversed and the case remanded to the Commissioner. A separate judgment in accordance with this opinion will be entered.

Dated this 31st day of January 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)